And Mr. Jensen, whenever you're ready, we'll hear from you, within reason. Thank you, Your Honors. May it please the Court. I'd like to begin with the two questions that the Court directed me to address. Is the Court able to hear me? The first is, what is the status of the social equity licensing process? The applicants for provisional licenses were selected in the lottery. Beyond that, I don't know the status of them converting to final licenses. The State would have to answer that. To address the Court's second question, how does selecting the applicants in the lottery impact relief in this case? It doesn't affect it at all, for multiple reasons. First of which is the defendants have conceded that it doesn't make any difference. Keep your voice up, please. Yes, Your Honor. You're speaking to us, not down to the podium. Okay, Your Honor. The second question was, how does selecting applicants in the lottery affect the relief requested? And the answer is, it doesn't affect the relief, for multiple reasons. Let me ask you just on that point. All the licenses have been issued? Well, it's a multi-step process to get a candidate. My question is, have all the licenses been issued? I don't, to my knowledge, no licenses have been issued. The number of people, take for example retail, there are going to be 80 licenses granted. 80 people were selected for provisional, I don't know the term they use. But then, if I can, for example, in the defendants, the plaintiff moved to expedite the appeal. The defendants opposed. On page 5 of their opposition, which is document 13.1, they talk about some of the steps that are necessary for the people selected in the lottery to get their license. And selected applicants may now pursue a conditional license and then full licensure. How many licenses are authorized? I don't know on the total one. 1,700, isn't it? No, there were 1,700 applicants. There are 80- I don't mean 1,700, yeah. There's a much lower number of licenses. There are 80 retail licenses. And then in addition to the cultivation and- And how many on each of those categories? I'm not sure. Those were not the ones we were pursuing. But I can tell you in just one moment because it's addressed in the- All right, stick with the 80. That's fine. So have any of those been issued? To my knowledge, no. But I'm taking that solely from the defendant's opposition to our motion to expedite, which was filed back in- That's a while back. We'll hear from them then. Correct. But I would like to point out that they have conceded it makes no difference. In their opposition to our motion to expedite, on page 2, they wrote- This is, again, document 13-1. In short, to the extent that the court resolves this appeal within the next 12 months in the normal course, an expedited appeal is unnecessary to preserve Mrs. Jensen's ability to pursue the remedy of enjoining cannabis licensure based on the criterion she alleges is unconstitutional. And that goes to the steps that the selected people in the lottery have to take to get their licenses. So what exactly is the remedy you're seeking at this point? I understand what you were seeking at the time the complaint was filed. I've read your complaint. What remedy are you seeking now? We're seeking an injunction against issuing of any licenses under the program. But the state's already issued provisional licenses, and I would assume those individuals have begun setting up their businesses. Perhaps they're already set up. Well, I don't know the status of them doing it. According to the state, they wouldn't have been able to get the businesses set up by now. In New York- But isn't this then the remedy you're seeking retroactive? I don't think so. To basically undo what the state has already done, and wouldn't that be precluded by sovereign immunity? No, Your Honor. I'm seeking to join final licenses, which to my knowledge have not been issued. But I do want to- But the state would have to rerun the whole program and undo what it's already done. That is correct. And I want to point out in New York, they had a similar program. A difference which is not really material is that the people selected were not selected by lottery. They were selected in a ranked system. In that, a year after that happened, a plaintiff sued to enjoin that, and the court enjoined everybody who was not at full final licensure ready to open before their complaint was filed. So a year later. The court could do something like that in the extent that anybody does have a final license and is ready to open. I would point out that this case is quite different from New York. In New York, the people sued a year, I think it was more than a year, after the applicants were selected. Here, the plaintiff sued before the date of the lottery was even announced, let alone held and then the applicants selected. So if the court were to issue an injunction effective as the date of the complaint, which we feel is appropriate, that would be all businesses, all applicants. So when it was filed, did you seek a TRO? Yes. And then lastly, I would point out that even if the court were to not consider that in determining whether to grant relief, there is going to be a second round, and the conditions for the second round indicate there will be another social equity. And that is the defendant's document 20 at page 38. If I can even back up one page, 37 discusses the first round, which is what we're talking about, and it talks about the social equity. Page 38 talks about the second round of licensing, and you'll notice in F1 it says, well, if I back up to E, it says the second round of licensing shall be in accordance with F or G of the section. Then down to F, the last sentence of that paragraph says applying minimum licensing qualifications, employing remedial measures consistent with the constitutional requirements, so not more than, talks about the licenses, the last sentence on that page again says, towards the end, the administration shall award licenses under paragraph one of the subsection through a lottery process that employs remedial measures. So the remedial measures are not yet defined for round two, but it's pretty clear where it's going. It's going to be another social equity program, and it will be another unconstitutional provision. Let me ask you on the constitutionality. First, unlike, for instance, the Massachusetts program, any resident from anywhere in the country can be a licensee. Provided they meet the qualifications, correct. Well, yes, yes, but those are uniform for everybody. And every social equity applicant can be from a resident of anywhere in the country, too. And the requirement for social equity is the public policy to basically engage people who have been down and out, who have been disproportionately suffered with respect to the drug wars, to give them a privilege to be a licensee. But it does not restrict those social equity to residents of Maryland or elsewhere. It's nationally, so the question is, how do you qualify to be a social equity, get that privilege, and you qualify by one of the three standards. And the three standards includes persons who attended six schools in Maryland where there are a lot of down and out students who have had experiences in life based on the Pell Grants, experiences in life that serve the public policy. My problem with your argument, at least at this point, I'm posing it because I want to hear your response, but my problem with your argument is, number one, a standard licensee can be from anywhere in the country. The state clearly did not require any kind of residency requirement. And for the board members, ownership members, cultivation members, or anything. And what it does have is a public policy that a group of the applicants should have this experience. But again, even with respect to that narrow group, it doesn't say you have to be a resident of Maryland or a resident of Pennsylvania or whatever. What it does say is one of the experiences we value as a legislature is those who attended the six schools in Maryland, like Coppin State and Morgan State and the other schools in Maryland that have this high level of Pell Grant applicants. I don't see how that discriminates against persons out of state or against interstate commerce. You can tell me that, explain it, but your client could clearly have applied for a standard without a problem. She wants to invoke a privilege that the state chose to give as a matter of public policy, but that privilege wasn't based on interstate commerce or out-of-staters. That privilege is based on what the legislature wanted to define as socially down and out people who they wanted to get into the enterprise business. Your Honor, that's not correct that the plaintiff could apply for a standard license. There is no standard retail license. The only way to get a retail- They use the word standard. Now, tell me what it is. If you're not part of the social equity applicant pool, what are you? You're not in the first round for- I'm not talking about first round. I'm talking about getting a license. There is no second round at this point. The only way to get a license- There's no standard license. Everybody has to apply through the social equity? In retail, correct. I can't speak to cultivation or whatnot because we didn't pursue that, but there is no way to get a retail license unless you're social equity. But that's just the first round. There's a second round and a third round. I mean, you just pointed out to us in the second round. Correct. We're talking about the first round, and there's no reason why she should be excluded from that. But the program, your challenge in the program is discriminating against interstate commerce.  And in the end, they want, hypothetically, because I don't know the exact number, 170 licenses. And 200 of those licenses are going to be social equity, and the rest are going to be what they call standard. That's the words used in the papers, standard licensees. I don't know- And my whole question is this is not a program that has aimed at favoring Marylanders over out-of-staters. Out-of-staters are qualified, whereas under the Massachusetts program, for instance, the directors and owners and everybody had to be residents of Massachusetts. There's no residency requirement here, nowhere in the whole program. There are two very distinct issues that are coming up, the first being whether you have to be a social equity applicant to apply, and the second being the Dormant Commerce Clause. I'm going to try to, in the time I have left, address both. There will be a second round. As I pointed out, the second round, it talks about remedial measures, which I assume is going to, not defined yet, but will be another social equity program. This would not be the first state that has limited all of their retail licenses to social equity applicants, even when they said we'll decide later on the future rounds, and they, in the end, decide that those are going to be social equity as well. To turn you to the judge's question- She could still be an owner. She would just be a partial owner, right? She cannot apply. She can only- She could own up to 35%. She would have to partner with a social equity applicant, would she not? She cannot apply. You're correct. She cannot apply on her own. The only way to do that would be if a social equity applicant agreed to take her on as a partner. I'd like to go to the judge's question about the Dormant Commerce Clause. The Dormant Commerce Clause is clear that it doesn't have to be a full bar to out-of-state. It has to create a preference for in-state. It has to create-it has to make the in-state and out-of-state not on equal footing. I've given the- Let me ask you this. Other than-regarding the Dormant Commerce Clause, other than-I know you cited in your brief this example about Mary Garland testifying to the- in its confirmation process. But what other indication do you have that Congress regulates or recognizes the adult use of marijuana or cannabis as a legitimate market? I guess I'm confused as to how you're saying the Dormant Commerce Clause applies here to something that is not recognized as a legitimate market by Congress. The Commerce Clause and the Dormant Commerce Clause are two entirely separate powers, albeit they derive from the same constitutional provision. The Commerce Clause grant of power to the federal government is wholly independent of the Dormant Commerce Clause restriction on state protectionism. They derive from different purposes. The point of the Dormant Commerce Clause is to prevent trade wars and what they call the balkanization of the states. That is independent of the federal government, which has left cannabis federally illegal, albeit there's no enforcement meaningfully going on at this point. They are allowing the states to have these licenses, grant these licenses, and conduct business. We've seen it all around the country. And that is exactly what the Dormant Commerce Clause is trying to prevent and target in preventing protectionism of its in-state people. But aren't the markets within states? They're not actually between states because marketing between states would be federally criminal. Well, that depends, Your Honor, whether you're talking about the product crossing state lines or the investment. And as far as product crossing state lines, that's not raised in this case. That would be a completely different Dormant Commerce Clause analysis because under Tier 1, you have to say, this is what I'm trying to serve my local purpose, and these are my available alternatives. It would be a different local purpose and different alternatives. So it's not raised by this case. This case is solely about out-of-state investment, and that happens all over the country. Some states allow out-of-state, and some don't. And, in fact, this, under their argument, they are allowing out-of-state. I know I'm supposed to tell you when it goes red. They told me that in office. They are allowing out-of-state. As Your Honor pointed out, you could potentially buy 35% of a social equity applicant's business if that applicant were willing to sell. So they are allowing out-of-state. What they're doing is creating a preference for in-state, granting the licenses. Well, they're not creating a preference for in-state. As Judge Niemeyer pointed out, it's a preference. One of the preferences is for individuals who went to school in-state for two years.  It's not a bar. It's not a prohibition of out-of-state, but I think it's a clear preference. In the record, we listed the in-state versus out-of-state students for each of the schools. It runs from, I think, in the 90% to the lowest was something like 46%. But that's just an experience, a life experience that the legislature identified. It's not a qualification, present qualification in terms of residency, market, extensive market, where somebody lives, how much money that's put in. I mean it basically says they want somebody with the three life experiences, one of them, to qualify for, to serve the public policy. And they're familiar with those six institutions and said if you were an alumna of those schools, you can use that as an experience. Or you can use a grade school experience. Or you can use where you lived, this type of thing. But the point is the system is not trying to discriminate against out-of-staters because it doesn't even limit social equity licensees to out-of-staters. The statute says, and I'm somewhat paraphrasing, but a school where 40% of the students were qualified for Pell Grants in Maryland. I believe it says in the state.  Six schools, right. But that doesn't mean that the students are necessarily from Maryland. The schools are in Maryland, but for example, Morgan State is 50% out-of-state students. The Dormant Commerce Clause does not require a prohibition on out-of-state. It requires a preference. No, it requires a discrimination. Correct. A preference for in-state. Well, why don't you pick this up on, we're way over the line. Why don't you pick this up on your rebuttal. Thank you. Mr. Chasm. Thank you, Your Honor. I may please the Court. Joshua Chasen, Maryland Office of the Attorney General. On behalf of the Maryland Cannabis Administration and its Executive Director, joining me at Council's table is Heather Nelson, Counsel of Record in the case as well. The District Court correctly denied Ms. Jensen's motion for preliminary injunction because she did not demonstrate that she is likely to succeed on the merits of her claim. And the balance of the equities and public interest weighed against granting the motion for preliminary injunction. Ms. Jensen sought injunctive relief and a declaratory judgment against a portion of Maryland's Cannabis Reform Act, which was passed by the Maryland General Assembly after Maryland voters added Article 20 to the Maryland Constitution. The Act establishes a program through which individuals may access regulated cannabis products through licensed cannabis businesses. And part of the Act addresses the criteria used by the Administration when it issued the first round of licenses to eligible recipients. What's the current state of the licensing program? Yes, Your Honor. And so, addressing this Court's order, there were, and let me provide some data and background. So, 205 applications were selected in the lotteries. There were 174 in March of 2024 and another 31 in June of 2024. To date, the Administration has issued 188 conditional licenses. That's as of yesterday. Additionally, the Administration has denied 7 applications, 3 applicants withdrew, and therefore there are 7 pending review as of yesterday. Of the 205 selected applicants, 16 qualified under the Pell Grant Criterion, which is at issue in this case today. And all 16, as of yesterday, have been issued conditional licenses. Conditional licenses are working towards a full license. So, it requires certain things like obtaining a location, working through zoning approval. All of that is codified in Comar 14.17.05.05 subsection 4. And the conditional license process is up to 18 months. So, the Administration has not issued any full licenses yet as part of this round, to be clear. And all licenses that the Administration was to issue in the first round, which is the only round that must include the Pell Grant Criterion, are spoken for. So, Ms. Jensen's request of relief is for this Court to remand with instructions for the District Court to grant a preliminary injunction. That's what she wrote in her briefing before this Court. The injunctive relief requested in Ms. Jensen's complaint contained two components. First, Ms. Jensen requested an injunction prohibiting defendants from taking any further steps to process any applications for cannabis business licenses from the application program that closed on December 12, 2023. And second, Ms. Jensen requested an injunction prohibiting defendants from enforcing any portions of the Maryland Code or Maryland regulations that favor Maryland residents over out-of-state residents for cannabis business licenses. Based on the lotteries that have already taken place and nearly all the conditional licenses being approved, there would be no applications left to process. The Administration has left... No, you didn't process any of them based on residency, did you? No, Your Honor. His request said based on a residency. And that's the second part of the request of relief in the complaint. That is correct, Your Honor. And so, that provision isn't even at play, period, as Your Honor is pointing out. Residency is not anywhere as a requirement for any licensee. That is correct, Your Honor. And so, encircling back to the argument before the Court today on behalf of the Administration, the Social Equity Applicant Criterion, as Your Honor pointed out, includes the Pell Grant Criterion. That requires a Social Equity Applicant to have at least one owner, one or more individuals. They have to have at least 65% ownership interest, who for at least two years attended a four-year institution of higher learning in the state where at least 40% of the individuals who attended the institution are eligible for the Pell Grant. This Court is well aware of that. I know Judge Niemeyer noted the six institutions. And there's the underlying fact that Ms. Jensen never submitted an application. So, Ms. Jensen submitted a request for information with the Administrator. The Administrator told her under the facts alleged in the complaint that she attended CWCSU Long Beach, and that's not one of these six institutions. Therefore, she would be ineligible under this criterion. And she didn't submit that application. Well, under that one, she could qualify under the other two. Or she could just get a standard license for something else. That's right, Your Honor. And so, all that's a challenge here is this third criterion, the Pell Grant criterion. And Ms. Jensen claims that it unconstitutionally discriminates against out-of-state residents under the Dormant Commerce Clause. That argument fails for two reasons. First, it's our position that the interstate market in recreational cannabis is illegal as a matter of federal law. And second – Yeah, but that hardly holds water because illegal markets are – that's the reason they're regulated. I mean the federal government regulates illegal markets in guns and drugs. And so it seems to me the better argument is that there's no residency requirement. And we're happy to rely on the papers as to the first piece of that argument, Your Honor. And so the second piece, as I'll get to, it doesn't favor Maryland residents. It applies equally to out-of-state residents as it does to Maryland residents. And for those reasons, the district court was correct to conclude that Ms. Jensen was unlikely to succeed on the merits of her claim. So, assuming the court disagrees with the state's position as to the first piece that the Dormant Commerce Clause does not apply here to recreational cannabis. I do have one question regarding – he cites the Gonzalez case, which does – where the court said that Congress does regulate the interstate market. I'm just trying to understand how this case is distinguishable from that case. So, yes, Your Honor. So, in Gonzalez, there is an acknowledgment of the existence of an interstate cannabis market. And it upholds Congress's authority to prohibit the possession, cultivation, and use of cannabis in a purely intrastate manner in a state where medical cannabis was legal. And so the holding from Wright, Gonzalez v. Wright, isn't necessarily applicable here because it doesn't contain any provisions related to medical cannabis. And that sort of relates to the Northeast Patients Group case, the First Circuit case. We have a difference of opinion from my friend on the other side as to how that case applies. Again, that dealt with Maine's Medical Marijuana Act. I kept referring to Massachusetts. I meant Maine. Maine. Yes, Your Honor. Maine's provision has a residency requirement. It does. And it seems to me that is not only materially, that's almost central to the whole analysis that makes this one different. That is our position. And there's also the Rohrabacher-Farr Amendment, Your Honor. It prohibits the use of federal funds to oppose state medical cannabis programs, the key distinction medical there. So the First Circuit holding is limited in its reach, and that's why we designate the difference. But even if the court disagrees with the state's position here and it undertakes a Dormant Commerce Clause analysis, the result shows that the district court correctly concluded that Ms. Jensen failed to show a likelihood of success on the merits. So we start first, this court starts first, with asking whether the state law discriminates against interstate commerce. There is no differential treatment between an in-state and out-of-state economic interest through the Pell Grant Criterion. There's no state protectionism designed to benefit the economic interests of the state because an individual can reside outside of the state but still attend one of these six institutions. We're not aware of anything in the factual record, nor what's publicly available, that these institutions don't allow out-of-state or non-American individuals to attend those institutions. And the criterion applies to Maryland and non-Maryland individuals alike. Out-of-state residents simply are placed in the same situation, the same place, as their out-of-state counterparts. Or Maryland counterparts, excuse me. That's not discrimination. And so we have these six institutions. In the reply brief, Ms. Jensen notes that the Appellees Application Program discriminates against applicants who have never lived in Maryland. And that's simply not true. And it's easily refuted. So take, for example, Washington Adventist University, one of the six institutions. According to its website, WAU School of Graduate and Professional Studies offers four undergraduate programs that are fully online. And in another example, the University of Maryland Eastern Shore offers five bachelor's degree programs in a fully virtual format. This gains you nothing. None of these universities restrict admission to Maryland residents. I think it's important. There are alumni and alumna of all out-of-state, of all these universities. I mean, this is not challenged. I think the point that we're trying to make there in response to the reply argument, Your Honor, is that you actually don't ever have to have even stepped foot in the state of Maryland to qualify for this Pell Grant Criterion. Oh, because you could have done it online. That is correct, Your Honor. And so that argument was presented in the reply brief just making that reference. So that goes even further to show that there are no in-state interests protected against out-of-state interests. With the determination that the Pell Grant Criterion does not discriminate against interstate commerce, the court then considers whether the state unjustifiably burdens the interstate flow of articles of commerce. That's the Pike test, of course. But there is no flow of commerce from out-of-state. The licenses are designed for individuals who are going to have businesses in the state of Maryland. Is there a limit on the number of licenses that will be granted? So under the statute, in total, there are certain limitations that get set, and that's – I believe – I'm just trying to get my number correct on the statute piece. It is attached as part of the brief, but Section 36401 of the Maryland Code Annotated Alcoholic Beverages and Cannabis Article, Sections E, F, and G. And so there's consultation that takes place, but there are certain limitations in place now, but, of course, that can be adjusted. I'm trying to understand whether the program has set a number or a regulation has set a number, or is that indefinite? I don't believe that the administration has set a specific number at this time, Your Honor. It sets a certain number of licenses that can be issued in each round. So we had the first round where the lottery occurred. There's a statute that deals with the second round, and so those have set numbers as are statutorily provided, but there's no set number in the scheme in total at this time about the number of licenses that are to be issued. What round would she be able to apply in? So the key piece to that, Your Honor, is that she would be able to apply in any round, assuming she meets the qualifications. So assuming she's not qualified under the Social Equity Applicant Criteria, the Pell Grant Criteria only applied in round one. That's the only round where it must be applied. And so we look to the second round, and the statute makes it clear there are measures that are to be supported, and it needs to award licenses under Paragraph 1 of the subsection. That deals with working with the Governor's Office of Small, Minority, and Women Business Affairs. That statute references that page 38 in Document 20. But she's not challenging the second round? No, Your Honor. We're only here on the first round. Can we get back to your colleague's argument about the residency requirement? I understand his argument to be that although you don't have to be from Maryland, there's a disproportionate advantage because these schools have either at least half or a majority Maryland students at the school. So he's sort of making a disparate impact argument under the Dormant Commerce Clause, and I'm not aware of cases that make disparate impact arguments under the Dormant Commerce Clause, but that seems to be what he's saying. Not that it's a perfect Venn diagram overlap of everyone that qualifies is a Maryland resident, but that you're more likely to be a Maryland resident if you qualify. So in addressing that argument, Your Honor, it's Ms. Jensen's burden to show the constitutional violation. We've heard pieces from the—and I believe there are references cited in the Joint Appendix about the percentage of students at each of these institutions who qualify as in-state versus out-of-state residents. There's no data to show what happens to those individuals upon their leaving the university. And so all that data shows is the percentage of students who attend those universities who qualify for in-state tuition or are out-of-state residents. It doesn't show that those percentage of individuals reside in the state following their attendance or graduation from these institutions. And that's her burden to show that data. She didn't do that. It's absent from the complaint as well. And so even taking the stretch of the disparate impact argument, as Your Honor is presenting it, that my friend on the other side is presenting here, it's not an argument that can go far enough. And it's Ms. Jensen's obligation to satisfy the constitutional violation standard. Again, she made no effort to tie where these individuals live. And again, I pointed it out as a response to the reply argument, but there's no requirement that these individuals, whether they're in-state or out-of-state, technically have to live in the state during their time studying if they're in an online degree program. And so the same reasons that the Pell Grant Criterion does not discriminate against out-of-state interests, it places no undue burden on out-of-state interests. And that's the test that the Supreme Court has elicited from Pike and also, I think, reaffirmed as a result of the pork producers case from 2023. Simply put, the regulation applies equally to in-state and out-of-state interests. It does not offend the Dormant Commerce Clause. Finally, the District Court did not abuse its discretion, concluding that the balance of equities and the public interest weighed against granting a preliminary injunction. Ms. Jensen didn't bring the lawsuit until after the application process had largely played out. Ms. Jensen's counsel acknowledged at the hearing on her motion for preliminary injunction that Ms. Jensen most likely learned of the application lottery in September of 2023, months before the deadline to submit an application to be eligible for that lottery. Her first contact with the administration was on December 28, 2023, after the window had closed. She filed her complaint in January, on January 26, 2024. Her motion for preliminary injunction followed later on February 6, 2024. By waiting until the process had neared its conclusion, until acting, Ms. Jensen acted unreasonably The application process necessitated hundreds of thousands of dollars and hundreds of staff hours to process, and that's only for the administration. Of course, there are the individuals who actually took the time to apply. We're not speaking on that data, of course. They're not a party to this case. But naturally, a decision in this case would impact those who have already received their conditional licenses and are working towards the full licenses, if the process were to totally start over. And I don't even know that that's the specific relief that Ms. Jensen has requested in this case. But it goes against the will of the Maryland voters. They overwhelmingly decided to enshrine the right for an individual of 21 years of age or older to use and possess cannabis and command the state to create a regulated adult-use cannabis regime. And it did that, and so delaying licensure would further frustrate the purpose of the act and undermine the will of the voters. Can you buy cannabis in Maryland now? You can, Your Honor. Not me, please. Sure. Well, anybody over the age of 21, 21 or older, can buy it. So if that does not disqualify you, then yes, Your Honor. And there are retailers who were part of a program. One of the questions that this panel had asked my friend on the other side is sort of the standard license. And so standard means that you can sell both medical and recreational. But, of course, there are other preexisting licenses that are not part of the social equity program. Most of those generated, of course, from medical cannabis use in the state of Maryland. And those retailers were eligible to be able to sell their products for a recreational purpose as well, presuming they met all requirements under Maryland law to do that. So individuals can currently go there. The regime has been set up. The idea is to, and this, again, goes to the public interest piece, prevent sort of the dark market from being the prevailing market in the state of Maryland. It really prevents the state from protecting the health and safety of Marylanders who enshrine this right in the Maryland Constitution. But, of course, the state has an obligation to make it safe, to make sure that these licensees are not exhibiting behaviors or selling products that would be harmful to the Maryland consumer who is eligible to purchase these products. For these reasons, the district court did not abuse its discretion in denying Ms. Jensen's motion for preliminary injunction. And appellees respectfully request that this court affirm the judgment of the United States District Court for the District of Maryland. Thank you very much. Mr. Jensen? Thank you, Anders. The Maryland legislature could have set a rule that said in order to qualify for social equity, you have to attend colleges that 40% of students qualified for Pell Grants in California. Can you imagine the uproar from the Maryland voters if they had done so? Because they know that having that rule for Maryland favors Maryland residents. If they had said it in California, that would have been a disadvantage to Maryland residents. We put in the brief the student breakdown for the six colleges. It ran from the 90% down to the 50%. Even if you take the one school that was closer to 50%, Maryland residents don't represent anywhere near 50% of the residents of the country. We don't know that. We don't know who was a resident before they attended college, during college. You do know during college.  And you don't know after college. In other words, this program is written today. It doesn't say you have to be a resident of Maryland. It says if you want to qualify as a social equity licensee, you have to have had one of three experiences. Correct. And they describe those three experiences. But it still applies to out-of-staters. And the people who attended that school could be out-of-staters. I'm sure there's a we don't have the data in the record, but we have nothing to say that everybody who graduated from these schools stayed in the state. Judge Berner mentioned that she's not aware of practical effects. I forgot the exact word she used for a dormant commerce clause. On page 15 of the appellant's reply, we do state that the and we quote the, I guess, interstate commerce or its effect is to favor in-state interests over out-of-state. So there is an effects portion of that. And, again, if you turn the page to 16, again, we quote a couple cases where if a state law discriminates facially in its practical effect or in purpose, where five of the six colleges are in, I believe, the 80 or 90% in-state residency, I think that's a pretty clear practical effect of favoring Maryland residents regardless of what percentage may later move out or people may. Well, I mean, you're looking at the data of the number of students that are enrolled currently. And they don't qualify. We're talking about graduates, someone who graduated from Morgan State and moves to California. That person can apply, correct? This isn't really the point of what you're saying. They don't have to graduate. They have to go for two years. But, yes, a person who graduates from one of the listed colleges and moves to California could apply. But I guess what I'm saying is the measure that you're using are students that are currently enrolled. Well, I use the only data that's available to us. All right, but there's no data regarding students who have since left or attended, I guess, since you said they didn't graduate, and moved somewhere else. There's no data in the record regarding that to show any discrimination. Well, I agree with part of what you're saying and disagree with part of it. I do not have the data on who moved out of state. As far as no data showing discrimination, I think it's pretty clear that in practical effect, limiting to six colleges, all of which is in Maryland, is going to favor Maryland. It doesn't limit it. That's my whole point. It's in a privilege that's extended to those people. But you could qualify also under the other two provisions. But she doesn't qualify under them. I understand. But the legislature is entitled to put some privileges and give benefit to the social equity. It doesn't say you have to be a resident on any of these. And they're talking about a lifetime experiences. And even the first two qualifications don't have to be experienced in Maryland. They could be experienced in New York City. The question is, do you have evidence here that Maryland is intending to discriminate against out-of-staters and in favor of in-staters? And it's hard to see when they have one of three privileges, any one of which would qualify, because that's in furtherance of its public policy. Now, you'd have to attack its public policy. You know, somebody who doesn't fit the social equity, let's take away the third one and just have the first two. They could have said that. The question is, isn't that something the legislature can do, is limit it in favor of public policy? This is not based on interstate commerce or residency. It's based on a type of experience that the applicant would have, which is intended to promote enterprise for the down-and-outers, to bring them into the enterprise business. The plaintiff meets their qualification. The plaintiff went to a college where at least 40% of the people qualified for Pell Grants. It wasn't in Maryland, which is the whole point. The legislature can select people, you said, based on a life experience. What they can't do is they can't violate the Dormant Commerce Clause. If they had left those three words in the state off of the end of that statute, then we wouldn't be here. The point of this is that they didn't just select – Well, those happen to be the six states with which the legislature is familiar. They're in state. They're six schools that have a population attending them who have come from poor economic circumstances based on one measure that they've selected. The question is, when they do that, they're looking for a type of person who is not in-state or out-state. They're looking for a type of person who has had experiences in the drug wars, had been disproportionately affected in connection with that, and to get them engaged in this process. That's the public policy. The public policy doesn't say anything about the engage in the drug war. It says a school where 40% – Impacted by the war on drugs. That's the language. That's their justification for it. That's the policy. The qualification is having been a student for at least two years at a school that has 40%. But that doesn't require that a person – For example, some states say you have to have been actually arrested or had a parent or child who was arrested for a cannabis crime. They don't have that. So they're treating everybody who went to a qualifying college equally, whether that person was arrested or had a parent or child arrested or not. They could have given that same experience to anybody. The statute does not say six colleges. It says 40% in the state. They left it to – I believe it was the agency who identified the six colleges. So they could have left that to the applicants to prove that their college had 40% Pell Grants. The state didn't have to take on that burden. They could have said – If the point of this is that people went to schools that leached 40% Pell Grant, and I don't know if you're familiar with Long Beach or not, but that is certainly an area where it has effective cannabis and other drug prohibitions. They could have served that burden. They could have done a lot of things. The question is whether what they did discriminates. I agree with that. That's the question before us, and we'll have to take that under consideration. But thank you very much. We'll come down and greet counsel and then take a short recess.
judges: Paul V. Niemeyer, DeAndrea Gist Benjamin, Nicole G. Berner